**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION**

| | | |
|---|---|---|
| **BRENNAN JAMES GRIFFIN** | | |
| | * | |
| **PLAINTIFF,** | | |
| **vs.** | * | **CIVIL ACTION NO.** |
| | | |
| **BP EXPLORATION & PRODUCTION,** | * | |
| **INC., A DELAWARE CORPORATION,** | | |
| **BP AMERICA PRODUCTION CO.,** | * | **JURY TRIAL DEMANDED** |
| **A DELAWARE CORPORATION,** | | |
| **TRANSOCEAN HOLDINGS, LLC.,** | * | |
| **A DELAWARE CORPORATION,** | | |
| **TRANSOCEAN DEEPWATER, INC.,** | * | |
| **A DELAWARE CORPORATION,** | | |
| **TRANSOCEAN OFFSHORE** | * | |
| **DEEPWATER DRILLING, INC.,** | | |
| **A DELAWARE CORPORATION,** | * | |
| **HALLIBURTON ENERGY SERVICES,** | | |
| **INC., A DELAWARE CORPORATION** | * | |

**DEFENDANTS.**

---

## B3 COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Brennan James Griffin ("Plaintiff" or "Griffin") by and through undersigned counsel, hereby brings this cause of action against BP EXPLORATION & PRODUCTION, INC. ("BP Exploration"), BP AMERICA PRODUCTION COMPANY ("BP America"), TRANSOCEAN HOLDINGS, LLC ("Transocean Holdings"), TRANSOCEAN DEEPWATER, INC. ("Transocean Deepwater"), TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC. ("Transocean Offshore"), and HALLIBURTON ENERGY SERVICES, INC. ("Halliburton") and alleges:

## INTRODUCTION OF PARTIES

1.      This is an action arising out of injuries suffered by the Plaintiff as a result of exposure to toxic substances due to the BP *Deepwater Horizon* Oil Spill on or about April 20, 2010 ("BP Oil Spill").

2.      Plaintiff is a citizen and resident of the city of Fairhope in Baldwin County, Alabama, and *sui juris*.

### *BP Defendants*

3.      Defendants BP Exploration and BP America (collectively "BP Defendants") are Delaware corporations with their principal places of business in Houston, Texas.

4.      BP Exploration was a leaseholder and performed oil exploration, drilling, and production-related operations in the Gulf of Mexico, including the Mississippi Canyon Block 252 ("Macondo Well") where the oil spill originated.

5.      The U.S. Coast Guard designated BP Exploration as a "responsible party" of the oil spill.

6.      At all times relevant to this action, BP Exploration purposely availed itself of the Court's personal jurisdiction by performing various acts that were related to the BP Oil Spill including:

   i.    Managing clean-up and/or response activities in or around the shores of Alabama, Louisiana, Mississippi, Florida, and Texas (collectively "Gulf States");

   ii.   Pumping crude oil during the spill that polluted the coasts of the Gulf States, including Alabama;

   iii.  Directing and participating with Unified Command, which contracted with various clean-up crew companies throughout the Gulf States;

iv.     Engaging in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities; and

v.      Registering to do business in, doing business in , and maintaining a registered agent in Louisiana and Alabama.

7.      BP America was a party to the drilling contract with Transocean Holdings for the drilling of the Macondo Well.

8.      The U.S. Coast Guard designated BP America as a "responsible party" of the oil spill.

9.      At all times relevant to this action, BP America purposely availed itself of the Court's personal jurisdiction by performing various acts that were related to the BP Oil Spill including:

i.      Managing clean-up and/or response activities in or around the Gulf States;

ii.     Pumping crude oil during the spill that polluted the coasts of the Gulf States, including Alabama;

iii.    Directing and participating with Unified Command, which contracted with various clean-up crew companies through the Gulf States;

iv.     Engaging in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities; and

v.      Registering to do business in, doing business in, and maintaining a registered agent in Louisiana and Alabama.

*Transocean Defendants*

10.     Defendants Transocean Holdings, Transocean Deepwater, and Transocean Offshore (collectively "Transocean Defendants") are Delaware corporations or entities with their principal places of business in Houston, Texas.

11.     At all times relevant to this action, Transocean Defendants purposely availed themselves of the Court's personal jurisdiction by performing various acts that were related to the BP Oil Spill, including:

    i.   Engaging in clean-up and/or response activities in or around the Gulf States;

    ii.  Manning and guiding the Deepwater Horizon Rig ("DHR"), which exploded while pumping crude oil, resulting in the mass discharge and prolonged seepage of crude oil throughout the Gulf States' coasts, including Alabama;

    iii. Directing and participating with Unified Command, which contracted with various clean-up crew companies through the Gulf States;

    iv.  Engaging in commerce by purchasing, distributing, and supplying goods and services to Gulf residents that include petroleum products, dispersants, as well as other supplies and services necessary for various response clean-up activities; and

    v.   Registering to do business in Alabama, doing business in Alabama, and maintaining a registered agent in Alabama.

*Halliburton*

12.     Defendant Halliburton is a Delaware corporation with its principal place of business in Houston, Texas.

4

13.     Defendant Halliburton's division Sperry Drilling Services (formerly Sperry Drilling Services) was responsible for mudlogging personnel and equipment on the *Deepwater Horizon*, including downhole drilling tools.  Sperry mudlogging personnel were jointly responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas levels, and pressure fluctuations. "Halliburton" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

14.     At all times relevant to this action, Halliburton purposely availed itself of the Court's personal jurisdiction by performing various acts related to the BP Oil Spill including:

    i.  Being responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo Well.  At and before the time of the blowout, Halliburton was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

    ii.  Registering to do business, doing business, and maintaining a registered agent in Louisiana and Alabama.

## JURISDICTION AND VENUE

15.     This is an action in excess of $75,000, exclusive of interest, costs, and attorney's fees.

16.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists among the parties.

17.     Alternatively, in the event this Court lacks jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction pursuant to 43 U.S.C. § 1349(b)(1), which provides, in relevant part, that "district courts of the United States shall have jurisdiction of cases

and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals."

18.     Furthermore, in the event this Court lacks jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) and 43 U.S.C. § 1349(b)(1), this Court has jurisdiction pursuant to 28 U.S.C. § 1333, including the Admiralty Extension Act, 46 U.S.C. § 30101, which extends the admiralty and maritime jurisdiction of the United States to "cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land."

19.     The causes of action in this Complaint arise under the general maritime laws of the United States and/or the laws of Alabama.

20.     Notwithstanding the above, the most appropriate venue in accordance with 28 U.S.C. §1391 is the Southern District of Alabama, as Plaintiff was exposed in the Southern District of Alabama and relevant evidence and witnesses are located in the Southern District of Alabama. Considering the relative ease of access to sources of proof, the ability to secure attendance of witnesses and the ability to minimize costs of witnesses, the appropriate venue for this cause of action is the Southern District of Alabama. Pursuant to 28 U.S.C. §1404 (a) and the procedure listed in the B3 Case Management Order issued by this Court on February 21, 2021,[1]  Plaintiff may seek to have this matter transferred to the appropriate venue in the Southern District of Alabama.

21.     All conditions precedent to the institution of this action have been satisfied or otherwise excused.

---

[1] *See* Rec. Doc. 26924.

## GENERAL FACTS

22.    All injuries detailed arise from the same transaction and/or occurrence relating to the BP Oil Spill, *Deepwater Horizon* explosion, and subsequent oil spill related events.

23.    Plaintiff references, incorporates, and adopts all findings of fact detailed in *Findings of Fact and Conclusions of Law* ("Phase One Findings"), MDL No. 2179, Rec. Doc. 13355, 21 F.Supp.3d 657 (E.D. La. 2014).

24.    Specifically, in Phase One, the court ascertained the facts and considered evidence as to all Defendants' negligence and/or liability surrounding the blowout and explosion of the *Deepwater Horizon* on April 20, 2010.

25.    After hearing the evidence, Judge Barbier found that all Defendants were each liable under general maritime law for the blowout, explosion, and oil spill. *Id*. at 746-47, 757.

26.    Judge Barbier further found that the BP Defendants had acted with gross negligence and willful misconduct; the Transocean Defendants' conduct was negligent; and Halliburton's conduct was negligent.  Fault was apportioned as follows:  BP Defendants:  67%, Transocean Defendants:  30%, and Halliburton:  3%.  *Id*. at 757.

27.    There was a full and fair opportunity to litigate the aforementioned liability, liability was actually litigated, all Defendants were parties and/or in privity with a party, and resolution of those issues was necessary for Judge Barbier's Phase One Findings.

28.    BP Exploration leased the *Deepwater Horizon*, a vessel, to drill exploratory wells at the Macondo prospect site.  As operator and primary leaseholder, BP's responsibilities included assessing the geology of the site, engineering the well design, obtaining regulatory approvals for well operations, retaining and overseeing the project's contractors, and working on various aspects of the well and drilling operations.

29.     On or about December 9, 1998, predecessors to all BP Defendants and all Transocean Defendants entered into a contract for the construction, use, and operation of the *Deepwater Horizon*.

30.     BP America contracted with Transocean Holdings to drill the Macondo Well.

31.     Halliburton manufactured a nitrogen foam cement slurry mixture ("Cement Mixture") to provide cementing and mudlogging services for the *Deepwater Horizon*.

**BP Oil Spill**
<u>Deepwater Horizon</u>

32.     On April 20, 2010, workers on the *Deepwater Horizon* oil rig lost control of the Macondo Well just after the final cementing work was completed.  During the cementing work, an explosion occurred on the *Deepwater Horizon*, and it caught fire.

33.     The explosion and fire caused the deaths of 11 people and at least 17 others were injured.

34.     The explosions and/or fire should have triggered the automatic function on the vessel's blowout preventer ("BOP"), however, that function failed, or the BOP failed to shut in the well.

35.     After burning for two days, the vessel sank to the ocean floor.

36.     The *Deepwater Horizon* was connected to the wellhead at the seafloor by a 5,000-foot pipe called a riser and, as the vessel sank, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely.  The riser, bent into a crooked shape underwater, extended 1,500 feet above the seabed and then buckled back down.  Oil flowed out from the open end of the riser, as well as through two breaks along its length.

37.     Millions of gallons of oil discharged into the Gulf of Mexico over the next 87 days.

38.     Finally, after multiple unsuccessful attempts, the well was capped and oil discharge was halted on July 15, 2010 and by mid-September, it was permanently sealed with cement.

39.     While crude oil was believed to be discharged before the *Deepwater Horizon* platform sank on or about April 22, 2010, the rate of discharge is believed to have increased once the *Deepwater Horizon* sank to the ocean floor.

40.     After the explosion and sinking of the *Deepwater Horizon*, BP Defendants attempted to downplay and/or conceal the severity the BP Oil Spill.  Its initial leak-estimate of 1,000 barrels of oil per day was found by government investigators to be a fraction of its measured leakage, 50,000 barrels per day.  Moreover, BP Defendants did not provide complete and timely announcements and warnings about the severity, forecast, and trajectory of the BP Oil Spill.

41.     On or about June 20, 2010, then-Congressman Edward Markey of Massachusetts released an internal BP document showing that the company's own analysis had revealed the actual rate of oil leakage to be 4,200,000 gallons per day and that the total oil leakage could reach 100,000 barrels.

42.     The flow of oil continued unabated and the oil made landfall on or about April 30, 2010.

43.     The BP Oil Spill created an oil slick with a range of thousands of miles and thick voluminous plumes of oil in the deep waters within the Gulf of Mexico.  The oil spill caused these slicks and plumes to form.

44.     The oil infiltrated and continues to infiltrate the delicate wetlands and intertidal zones that protect the coasts of Louisiana, Mississippi, Alabama, Texas, and Florida.

45.     An estimated 200 million gallons of crude oil infiltrated sensitive coastland and intertidal ecosystems.

46.     After the Oil Spill, the United States Coast Guard formally and/or informally designated, *inter alia*, BP Defendants and the Transocean Defendants as "responsible parties" under the Oil Pollution Act ("OPA").

47.     Following an exhaustive investigation into the cause of this enormous disaster, a White House commission faulted the BP Defendants and its partners for a series of cost-cutting measures that led to insufficient safety systems. In November 2012, BP Defendants pled guilty to 11 counts of manslaughter and one felony count of lying to Congress[2], for which the oil giant agreed to pay billions in criminal fines, penalties and restitution.

48.     The leaked crude oil contains many highly toxic and hazardous chemicals that can damage nearly every system in the human body.

49.     In the wake of the disaster, and pursuant to its duties and responsibilities under the OPA, BP Defendants began implementing a response and containment plan.

50.     The "BP Oil Spill" includes the events, actions, inactions, and omissions leading up to, during, and subsequent to:

i.      The blowout of the Macondo Well, which was drilled by the Transocean Marianas and DHR on the Outer Continental Shelf in the Gulf of Mexico, approximately 130 miles southeast of New Orleans, Louisiana;

ii.     The explosions and fire on board the DHR on or about April 20, 2010;

---

[2] "[T]he felony obstruction of Congress charge reflects the fact that the defendant's criminal conduct extended beyond the events surrounding the blowout itself to the defendant's untruthful post-spill conduct in understanding the scope of the ensuing oil spill to Congress… BP, through a former vice president, withheld information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD…On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent 'pressure data was obtained from the BOP stack.' At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010" See Guilty Plea Agreement at 1, U.S. v. BP Exploration & Production, Inc., No. 2:12-CR-00292 (E.D. La, Nov. 15, 2012), ECF No. 2.

iii. The sinking of the DHR on or about April 22, 2010;

iv. The release of oil, other hydrocarbons, and other toxic substances from the Macondo Well and/or the DHR and its appurtenances;

v. The efforts to contain the Macondo Well; and

vi. Response activities performed by clean-up workers under the direction of Unified Command.

51. BP Defendants were the operators of the Macondo Well under federal regulations of the Minerals Management Service ("MMS"); therefore, they were the entities the lessee(s) designated as having control or management of operations.

52. As operators and primary leaseholders, BP Defendants were responsible for, but not limited to, assessing the geology of the site, engineering the well design, obtaining regulatory approvals for well operations, retaining, and overseeing the projects contractors, and working on various aspects of the well and drilling operations.

53. In the aftermath of the BP Oil Spill, the BP Defendants hired various incentivized consultants and contractors that generated "scientific" findings and testing biased in favor of the BP Defendants. These include BP's environmental,[3] Industrial Hygiene,[4] and litigation support contractors that supervised or assisted in the creation the monitoring and sampling data.

---

[3] BP hired Exponent during the Spill to collect and oversee the environmental and chemical dispersant data gathering, as well as other services. As stated by Dr. David Michaels—PhD, MPH, epidemiologist and professor at George Washington University—"[g]ive Exponent an A+ for manufactured uncertainty." Michaels, D. (2008). *Doubt is their product: How industry scientists manufacture uncertainty and threaten your health* (p. 138). Oxford University Press. "Having cut their teeth manufacturing uncertainty for Big Tobacco, scientists at . . . Exponent, Inc., and other consulting firms now battle the regulatory agencies on behalf of manufacturers of benzene, beryllium, chromium, MTBH (methyl tertiary-butyl ether), perchlorates, phthalates, and virtually every other toxic chemical in the news today." *Id*. at 46. "They profit by helping corporations minimize public health and environmental protection and fight claims of injury and illness." *Id*.

[4] BP's lead Industrial Hygiene contractor during the Oil Spill—Center for Toxicology and Environmental Health ("CTEH")—had a "vested interest in finding a clean bill of health to satisfy its corporate employer" according to experts. *See Record of BP's Gulf Worker-testing firm raises conflict-of-interest questions*. The New York Times. Retrieved July 21, 2022, from https://archive.nytimes.com/www.nytimes.com/gwire/2010/06/18/greenwire-record-of-bps-gulf-worker-testing-firm-raises-84788.html. CTEH was later faulted for "improper sample collection

54.     BP Defendants incentivized contractors set detection and reporting limits for chemicals of concern at high levels (*i.e.* screening levels), and any detection of chemicals that fell below that selected limit were often recorded as a zero value or non-detection. The Industrial Hygiene data collection plans were designed or contemplated, in part, to limit the BP Defendants' liability in future litigation and manufacture scientific doubt about the harmful effects of the BP Oil Spill. Scientists attempting to work with this data years later to create peer-reviewed and neutral science have described the BP Defendants contractor created testing as "censored" data.[5]

DW Toxic Chemicals

55.     For purposes of this action, crude oil, hydrocarbons, benzene, and/or products containing benzene, which are all associated with the clean-up efforts from the Macondo Well and the *Deepwater Horizon* explosion, are collectively known as "DW Toxic Chemicals."

56.     After the disaster, BP Defendants began implementing a disaster response plan to prevent oil from escaping the blown out well, manually contain the oil, and disperse oil in the water using chemical dispersants.

---

procedures, and a 2008 Environmental Protection Agency audit similarly found deficiencies in the company's air-monitoring at the site of a Tennessee coal ash spill." Chase Woodruff, C. N. S. 4. (2020, September 4). *Oil companies rely on controversial firm to rebut Colorado Health Study*. Colorado Newsline. Retrieved July 21, 2022, from https://coloradonewsline.com/2020/09/04/oil-companies-rely-on-controversial-firm-to-rebut-colorado-health-study/. "This firm also performed toxicity testing on Chinese drywall and found no health risks even though other independent tests had." Button, G. (2016). *In Disaster culture knowledge and uncertainty in the wake of human and environmental catastrophe* (p. 233). Taylor and Francis.

[5]  *See* Huynh T, Ramachandran G, Banerjee S, Monteiro J, Stenzel M, Sandler DP *et al.*, *Comparison of methods for analyzing left-censored occupational exposure data. Ann Occup Hyg* 2014; 58: 1126–1142 ("Over 150,000 personal exposure measurements for an array of contaminants were collected; however, a substantial number of these measurements was below the limits of detection (LOD) reported by the analytic laboratories, or left-censored (Type I censoring) . . . Despite the large number of measurements, in many cases the number of available measurements for specific exposure groups is small (e.g., <10) and many exposure groups have a high percentage of censored data (50–100% for many groups). In addition, these measurements are often marked by high variability, probably due to the non-routine nature of some of the activities and changes in these activities over time.") Scientists with the National Institute of Environmental Health and National Institutes of Health noted that approximately 95% of the samples for Total Hydrocarbons and BTEX (benzene, toluene, ethylene, and xylene) were "censored" due to the limits of detection set by contracted laboratories. *See* RK Kwok, LS Engel, AK Miller, et al., *The GuLF STUDY: a Prospective Study of Persons Involved in the Deepwater Horizon Oil Spill Response and Clean-up*, Environ Health Perspect., 125 (2017), pp. 570-78.

57.     BP Defendants' response plan included the use of chemical dispersants, specifically Corexit, to break down the oil into finely dispersed droplets.

58.     Upon information and belief, immediately after the *Deepwater Horizon* disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants to the oil slicks and sheens on the surface of the Gulf of Mexico.

59.     On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP Defendants within 24 hours of issuance to identify and use chemical dispersants that are less toxic than the Corexit dispersants.

60.     On May 20, 2010, BP Defendants objected to changing dispersants and notified the EPA that it would continue using Corexit.

61.     BP Defendants' use of Corexit skyrocketed:  on May 22, 2010, BP used 45,000 gallons and on May 23, 2010, it used 70,000 gallons.

62.     On May 26, 2010, the EPA directed BP Defendants to reduce overall use of Corexit by 75%.  The May 26, 2010 EPA directive also required BP Defendants to eliminate use of chemical dispersants on the surface except in rare cases where an exemption is sought in writing from and approved by the USCG Federal On-Scene Coordinator in charge of the Response.

63.     Since the May 26, 2010 EPA directive, BP Defendants sought more than 40 exemption requests to use chemical dispersants on the surface and subsea in the Gulf of Mexico.

64.     The dispersant-treated and raw crude oil carried significant public health risks because it contained many highly toxic chemicals that can damage various systems in the body.

65.     Specifically, crude oil contains benzene and other volatile organic compounds such as ethylbenzene, toluene, xylene, naphthalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes, and heavy metals such as aluminum, cadmium, nickel, lead and zinc.

13

66.     The aforementioned organic compounds cause severe harm to human health.

67.     Chemicals such as benzene, PAHs, and many other chemicals in crude oil are toxic, and move from the oil into the air.  Once airborne, these chemicals and fugitive emissions, with pungent petroleum like odors, can blow over the ocean for miles, reaching communities far from the location of the spill.

68.     According to the Agency for Toxic Substances and Disease Registry, which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen. Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain, and lethal central nervous system depression.

69.     A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, chromosomal abnormalities in lymphocytes and bone marrow cells, damage to the immune system, and abnormal development of blood cells. Long term, low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping, memory loss, and cancer.

70.     As a result of the explosion of the DHR, DW Toxic Chemicals and many highly toxic dispersants were released from the Macondo Well and reached the shores of the Gulf States.

<u>Toxic Dispersants</u>

71.     Aside from DW Toxic Chemicals, BP Defendants purchased highly noxious chemical dispersants from Nalco, a chemical manufacturer, and/or its subsidiaries and sprayed them as part of the response activities performed in the clean-up efforts.  These dispersants manufactured by Nalco include Corexit EC9500A and Corexit EC9527A.

14

72.     The Corexit products contain hazardous substances, is harmful to human health, and that dermal exposure, inhalation, and ingestion should be avoided.

73.     Corexit EC9500 is an eye and skin irritant and may irritate the respiratory tract if inhaled, for example, it may cause chemical pneumonia.

74.     Corexit EC9527A contains 2-butoxyethanol, also known as EGBE.  Repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys, and the liver.  EGBE may be carcinogenic to humans.  It is an eye, nose, and throat irritant that causes nausea, vomiting, diarrhea, and abdominal pain.  Exposure to EGBE can also cause headaches, dizziness, lightheadedness, and unconsciousness.

75.     All of the aforementioned harmful dispersants, Corexit EC9500A and Corexit EC9527A, are hereinafter collectively referred to as "Toxic Dispersants."

76.     According to the BP *Deepwater Horizon Gulf Study*, funded by BP Defendants themselves, upstream petrochemical workers have reported experiencing leukemia, multiple myeloma, melanoma, and esophageal adenocarcinoma.

77.     On or about April 23, 2010, BP Defendants and/or their agents began applying Toxic Dispersants to the oil on the surface of the Gulf of Mexico. Toxic Dispersants were sprayed onto the ocean surface from aircrafts that flew over areas with oil and dispensed chemicals from cargo holds, fountain type jets on the decks of boats, and smaller vessels onto the surface of the water. Toxic Dispersants were also injected immediately below the surface of the water from vessels, deep below the surface of the ocean, and even sprayed by hand. These Toxic Dispersants were sprayed day and night, exposing anyone near the coastal areas, despite warnings not to.

78.     According to BP's Gulf Study which was based on the health effects of zone residents and clean-up workers around the BP Oil Spill, the toxic effects on the human body are 52 times more toxic when Corexit and crude oil are combined.

79.     The dispersants used by BP Defendants are known to cause, *inter alia*: headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

80.     BP Defendants and its contractors have used more than 1.8 million gallons of toxic dispersants in the Gulf of Mexico in connection with the BP Oil Spill.

### Plaintiff's Exposure

81.     Plaintiff was exposed to BP Oil and/or toxic dispersants in and around Alabama. Specifically, in and around Fairhope, AL, Mobile Bay, AL, Perdido Key, FL and Destin Beach, FL.

82.     Plaintiff was exposed due to:

    i.   The close proximity from his residence to areas affected by the BP Oil Spill.

    ii.  Visiting his grandparent's condo, located in an area affected by the BP Oil Spill.

    iii. Participating in recreational activities including swimming, kayaking, vacationing, and visiting beaches in the areas affected by the BP Oil Spill;

    iv.  Consuming contaminated seafood from the waters of the Gulf of Mexico.

83.     Plaintiff was exposed through inhalation, ingestion, and dermal contact due to the aforesaid pathways of exposure.

84.     Plaintiff was neither warned that personal protective equipment ("PPE") was needed while conducting any of the aforesaid activities nor was Plaintiff warned to avoid the water or any location at any time.

## EQUITABLE TOLLING

A.  Fraudulent Concealment

85.     Following the explosions that ignited the vessel on April 20, 2010, a gas-fueled fire blazed on the Deepwater Horizon for two days until the rig eventually sank on April 22, 2010. On the sea surface, the Deepwater Horizon had been connected to the wellhead at the seafloor by a 5,000-foot marine riser pipe, and as the vessel sank to the seafloor, it dragged the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser bent into a crooked shape underwater, now extended 1,500 feet up from the wellhead and buckled back down. Immediately oil and natural gas began to gush from the open end of the riser and from at least two places along its twisted length.

86.     For 87 days, the surge of oil and gas from the gushing well continued unabated, and the Oil Spill's fast-growing oil slick made landfall on April 30, 2010, affecting increasingly larger areas of the Gulf coast as it was driven landward by currents and winds. Once the oil reached the coasts, it damaged the pristine beaches and delicate wetlands, marshes, and estuaries that line the coasts of the Gulf Coast Areas, destroying the habitats and spawning sites of marine life, as well as the tourism industry and property values in those coastal areas.

87.     From the outset, BP attempted to downplay and conceal the severity of the Oil Spill. BP failed to promptly and comprehensively communicate information about the severity, forecast,

and direction of the spill. Additionally, BP impeded scientists' attempts to assess the extent of the disaster both on land and at sea. *The New York Times* reported on May 16, 2010, that "BP has resisted entreaties from scientists that they be allowed to use sophisticated instruments at the ocean floor that would give a far more accurate picture of how much oil is really gushing from the well."

88.     BP's obstructionist behavior regarding accurate data continued as the Oil Spill progressed. In the months immediately following the explosion, senior-level BP officials purposefully hatched a criminal plan to present to the public and to federal investigators, fabricated, false data regarding the "flow rate," and other information about the "post spill" cleanup efforts. Initially, BP represented to the federal government that approximately 1,000 barrels per day were leaking from the wellhead. This estimate was found by government investigators to be a fraction of its actual measured leakage amount in excess of 50,000 barrels per day. On or about June 20, 2010, Congressman Edward Markey released an internal BP document showing that the BP's own internal analysis had shown that the rate of oil spillage could reach as high as 100,000 barrels, or 4,200,000 gallons, per day.[6]

89.     Based upon the fabricated "post-cleanup" information and its conduct, BP entered a felony guilty plea, including for acts related to its false and misleading statements based upon what the Eastern District of Louisiana condemned as a litany of specific false representations regarding BP's conduct in relation to the post-cleanup effort.[7] BP admitted during its guilty plea that the company, through a senior executive, obstructed an inquiry by the U.S. Congress into the

---

[6] Joe Weisenthal, *Internal BP Document Says Spill Could Reach 100,000 Barrels Per Day*, (June 20, 2010), available online at https://www.businessinsider.com/internal-bp-document-says-spill-could-reach-100000-barrels-per-day-2010-6
[7] Office of Public Affairs | BP Exploration and Production Inc. Pleads Guilty, Is Sentenced to Pay Record $4 Billion for Crimes Surrounding Deepwater Horizon Incident | United States Department of Justice. (2017, May 2), available online at https://www.justice.gov/opa/pr/bp-exploration-and-production-inc-pleads-guilty-sentencedto-pay-record-4-billion-crimes#:~:text=BP%20also%20admitted%20during%20its,while%20the%20spill%20was%20ongoing.

amount of oil being discharged into the Gulf while the spill was ongoing.[8] BP also admitted that the senior executive withheld documents provided false and misleading information in response to the U.S. House of Representatives' request for flow-rate information, manipulated internal estimates to understate the amount of oil flowing from the well and withheld data that contradicted BP's public estimate of 5,000 barrels of oil per day.[9] At the same time that the senior executive was preparing his manipulated estimates, BP admitted the company's internal engineering response teams were using sophisticated methods that generated significantly higher estimates.[10]

90.     BP's fraudulent conduct did not stop at misrepresenting the magnitude or flow rate of the spill. BP conducted a series of actions aimed at diminishing and concealing air and health monitoring data that it was mandated to collect in the wake of the Deepwater Horizon Incident. Almost immediately after the Deepwater Horizon Oil Spill in the summer of 2010, BP began to contemplate ways to manufacture scientific uncertainty in the data to defend against future civil and criminal litigation. As a result of BP's criminally negligent conduct during the BP Oil Spill, the victims have been forced to carry the burden of the scientific uncertainties created by BP. According to Representative Garret Graves from Louisiana, "BP views us as a colony that they own and can exploit."[11] BP would rather fight with its army of attorneys instead of addressing its criminal wrongs. It would rather pay fines and penalties when it is forced to rather than voluntarily attempt to correct its corporate malfeasance and corporate culture of profit over safety.

91.     Shortly after the Deepwater Horizon Incident, BP hatched a plan to gain the upper hand against inevitable personal injury litigation by underreporting the harm BP oil and dispersants

---

[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] Titcomb, J. (2013, August 15). Gulf Spill Lawyer: "BP treats us as a colony." The Telegraph. Available online at https://www.telegraph.co.uk/finance/newsbysector/energy/oilandgas/10245707/Gulf-spill-lawyer-BP-treats-US-as-a-colony.html; *see also* Thomson Reuters (2013). BP puts Louisiana justice on trial. Financial Post. Available online at https://financialpost.com/commodities/energy/bp-puts-louisiana-justice-on-trial

posed to the general public and cleanup workers. BP directed its industrial hygiene operations through its legal department to establish a veil of confidentiality. BP staff, including its lead industrial hygienist responsible for assessing nearshore and onshore exposure, consistently liaised with BP legal counsel to scrutinize sample data and support industry-favorable talking points. In effect, BP's legal department was intimately involved in decision-making regarding the collection of air monitoring samples and the reporting of these samples to the federal government and the public, which runs counter to BP's representations that "Congress tasked the federal government, not BP, with directing the *Deepwater Horizon* spill response . . . ."[12] BP's attorneys in present day assert that BP's "work with its consultants in determining what data would be collected, how the data would e collected, or the consultants' analysis of the data is privileged" attorney work product. In turn, much of the internal sampling decisions and protocols have been withheld from public scrutiny under the guise of attorney work-product" and "attorney-client privilege" and BP has garbled the truth about the veracity of its sampling and monitoring programs.

92.    BP Legal's direction of the science is evident from BP's lead Industrial Hygienist's admissions to being "a regular participant" in "several attorney-directed workstreams," including: (1) "attorney requested analysis and summarization of industrial hygiene samples in anticipation of litigation," (2) drafting "notification letters to Response workers in anticipation of litigation," (3) "Attorney analysis of exposure literature and studies to support litigation defense," (4) "Job safety and environment analysis in anticipation of litigation;" and (5) "Attorney review of field sample audit reports in anticipation of litigation."[13] Instead of faithfully compiling post-spill monitoring data, BP's industrial hygienists were "soliciting and obtaining legal advice" pertaining

---

[12] BP Defs.' Opposition at 2, *Bruton v. BP Expl. & Prod. Inc., et al*, Case No. 17-cv-03110, Rec. Doc. 94 (E.D. La. Oct. 20, 2022).
[13] Decl. of David R. Dutton at 3, *Becht v. BP Expl. & Prod. Inc., et al.*, Case No. 3:21-cv-00551, Rec. Doc. 81-4 (E.D. La. July 11, 2023).

to the aforementioned workstreams from BP's attorneys.[14] In turn, BP has been able to conceal knowledge of the harmful effects of the spill from the public as well as taint the scientific literature.

<u>Insufficient Monitoring Plans</u>

93.     The effort to under-report the harm during and after the Oil Spill began with BP's retention of CTEH and Exponent—incentivized data collection and third-party litigation support contractors—to assist in creating the "exposure data" and scientific publications to assuage public perception and defend against future litigation. CTEH and Exponent are not independent scientists but paid BP contractors, producing "scientific" works-for-hire that necessarily favor the BP Defendants in personal injury and environmental litigation. These contractors essentially created the "exposure data" and science heavily relied on by experts and the public at large.

94.     CTEH was contracted to perform Industrial Hygiene monitoring during the Oil Spill Response. BP Defendants had knowledge that CTEH was incentivized to under-report the health and safety side of the Oil Spill since it was paid to ensure regulatory compliance for its clients by finding the least protective rules and regulations and relying on those for its monitoring and sampling plans.[15]

95.     In fact, on June 25, 2010, Representatives Capps and Welch issued a letter to BP requesting that BP must "[r]emove CTEH from their role as primary monitor of health issues" and "[e]nlist an independent, well-respected toxicology center to take over this role and ensure valid and reliable public health monitoring" because of CTEH's long history of questionable practices of releasing findings "defending the corporate interests that employ them."

---

[14] *Id.*

[15] Again, BP's hiring of CTEH amounted to the "fox guarding the chicken coop" since CTEH was an interested non-party hired by Defendants to find that chemicals of concern in the air were not present at unsafe levels. *See* Schor, E. (2010, June 18). *Record of BP's Gulf Worker-testing firm raises conflict-of-interest questions.* Greenwire. Avaiable online at https://archive.nytimes.com/www.nytimes. com/gwire/2010/06/18/18greenwire-record-of-bps-gulf-worker-testing-firm-raises-84788.html.

96.     Further, Dr. Michaels, former Assistant Secretary of OSHA during the Spill, wrote a letter to the National Incident Commander stating OSHA's "growing concerns over significant deficiencies in BP's oil spill response operations related to worker safety . . . ." and that "[t]hese deficiencies present potentially grave consequences for the workers involved in the cleanup, and will become increasingly acute as more oil hits the shore, more workers are involved and the complexity of the response increases."[16]

97.     Armed with this knowledge, BP still failed to take any reasonable action, and, unsurprisingly, the sampling protocol CTEH and BP employed lived down to its reputation. CTEH protocols often directly contradict the Environmental Protection Agency's guidelines for collection. For example, while the EPA instructs samples should only contain sediment, and not preexisting soil, CTEH's manual calls for a "bulk soil sample", which involves mixing together dirt from different parts of the site. [17] Further, while the EPA instructs samples should be taken by scraping the surface of the soil, CTEH's practice is to collect samples "from the surface up to six inches in depth."[18] Further, BP documents show BP Industrial Hygienist John Fink expressing concern that CTEH was undertaking oil mist monitoring without having adequately documented their sampling protocol: "During our IH [Industrial Hygiene] strike team telecon today, there were way too many legitimate questions being asked that we didn't have answers for … I just wanted to make sure our ducks were in a row before we started collecting data."[19]

---

[16] *See* Dr. Michaels' Memorandum Re: DOL-OSHA's Serious Concerns for Worker Safety and Health, May 25, 2010, https://web.archive.org/web/20100707034310/https://transportation.house.gov/media/file/press/o shamemotoadmallen%20(2).pdf
[17] Science For Sale, *How Murphy Oil, USA and the Center for Toxicology and Environmental Health have downplayed health risks from Murphy's million gallon oil spill in St. Bernard Parish*, pg. 10 (n.d.), available online at https://labucketbrigade.org/wp-content/uploads/2020/08/Science-for-Sale-2006.pdf
[18] *See id.*
[19] *See* July 29, 2010, Correspondence re: Oil Mist Protocol, attached hereto as **Confidential Exhibit 1.**

98.     Moreover, CTEH realized that the air monitoring methods and procedures being utilized were producing unreliable results. A report authored by CTEH concluded "based on this assessment and further consultation with RAE systems technical resources, it can be concluded that benzene data collected from the UltraRAE used on the source control vessels may be unreliable." [20] The document goes on to note that "significant disqualifiers" of the data included "poor calibration techniques and the use of non-recommended calibration gas."[21]

99.     As CTEH generated sampling data showing a "safe" work environment, BP was made aware that a number of deficiencies were present in its sampling.[22] Among the more egregious complaints, document evidence shows BP was aware that too few chemicals were being sampled, too few locations and workers were being sampled, and OSHA and BP sampling was being poorly documented.[23] This sentiment was reemphasized by the Chronic Disease Epidemiology Group, which described the inadequate documentation of the CTEH sampling program: "The CTEH IH-Safety [team] had real time access and entered the relevant sample data directly into the database. The limitation of this approach is that there is no paper copy of the IH field notes to investigate possible errors in the field notes populated in the sampling data base."[24] Instead of addressing these deficiencies, BP ignored them because its main purpose in collecting the monitoring data was not to protect the health and safety of individuals who may be exposed to its crude oil and dispersants. Rather, the flawed data was primarily collected for litigation defense because the data "add value in the eyes of public perception, and add value in defending potential future litigation."

---

[20] *See* CTEH Report re: Evaluation of Air Monitoring Methods and Procedures on Off-shore Vessels, attached hereto as **Confidential Exhibit 2.**
[21] *Id.*
[22] *See* Eileen Senn "dangerously deficient data" Correspondence, *Hinley v. BP Expl. & Prod. Inc., et al.*, Case No. 19-cv-03474, Rec. Doc. 29-4 (N.D. Fla. Nov. 6, 2023).
[23] *See id.*
[24] "FOIA Response from FOIA Coordinator Shevon Johnson," June 24, 2022, attached hereto as **Exhibit 3.**

100.    BP also hired Exponent Inc ("Exponent") during the Spill to collect and oversee the environmental and chemical dispersant data gathering as well as other services. Exponent is now infamous for its staunch defense of corporate interests and as a frequent consultant and expert service for defendants involved in toxic tort litigation. "They profit by helping corporations minimize public health and environmental protection and fight claims of injury and illness."[25] BP's retainer agreement with Exponent explicitly requests that Exponent, who was involved with sampling and monitoring the extent of the oil spill, "render legal advice, to provide advocacy in administrative and judicial proceedings, and to prepare its defense in potential enforcement proceedings in this matter . . ."[26]

101.    BP was scolded numerous times for its flawed and fraudulent sampling practices its contractors performed. While government scientists at NOAA and EPA may have been looking to collect scientifically reliable oil sample data, numerous internal BP documents show that BP was not looking to collect oil at all and, seemingly, was intentionally avoiding sampling visible oil to the befuddlement of neutral scientists.[27] While Exponent samples taken at Bon Secour were "non-detects" for PAH analytes, BP's own employee challenged the samples stating that "what [he] observed in the field was definitely oil."[28]  Further, BP neglected to instruct its contractors to take samples in areas where it was evident that sampling may be necessary. On August 29, 2010, the Alabama Fish and Wildlife showed CTEH and BP evidence of "oil mist" at Bon Secour, but CTEH scientists stated they were "asked not to sample."[29] Government scientists also noted that

[25] Michael D. (2008). *Doubt is their product: How industry scientists manufacture uncertainty and threaten your health* (p.138). Oxford University Press.
[26] *See* Exponent Retention Agreement, *In re Deepwater Horizon BELO Cases*, Case No. 3:19-cv-00963, Rec. Doc. 691-12 (N.D. Fla. Feb. 28, 2024) (emphasis added).
[27] *See* Bon Secour Email Correspondence, *Hinley v. BP Expl. & Prod. Inc., et al.*, Case No. 19-cv-03474, Rec. Doc. 29-11 (N.D. Fla. Nov. 6, 2023).
[28] *Id.*
[29] *See* Email Correspondence re: Bon Secour "Oil Mist" Report, *Hinley v. BP Expl. & Prod. Inc., et al.*, Case No. 19-cv-03474, Rec. Doc. 32-1 (N.D. Fla. Nov. 16, 2023).

BP was intentionally sampling in locations so as to *not* find any oil.[30] BP's environmental consultant, Exponent, was warned that its sampling protocol was insufficient to sample submerged oil, and government scientists instructed that changing protocol was necessary to avoid finding "no oil when infact [sic] there is oil[,]" because "the oil that is present is significant" and "a real threat."[31]

102.    BP was also warned by the National Oceanic and Atmospheric Administration ("NOAA") that its anticipated "Broader Gulf of Mexico Water Column Study" presented significant issues that would undermine the utility of data gathered, leading to numerous false positives during sampling efforts. NOAA specifically cautioned that "collection of information based on incomplete plans, use of inappropriate monitoring tools and technicians, and insufficient sampling is likely to create more problems and uncertainty caused by a high likelihood of producing false negatives."[32]At bottom, NOAA concluded that *none of the sample plan's stated objectives could be met*, due to "serious and fundamental flaws in the study plan design."[33]

103.    Among NOAA's concerns, BP was advised that (1) NOAA had inadequate time to review the Gulf Wide Plan due to delays with Entrix distributing the stated plans to the Trustees, (2) the proposed Toxicity methods were not appropriate for estimating the effects of *in situ* burn sites. "*None of the analyses proposed in the plan will provide defensible information as the sampling plan is inadequate to document the extent, or the change in the extent, of the subsurface contamination.*"[34] Since BP's proposed plans were inappropriate for estimating the effects of *in situ* burns or impacts to site relevant species, "the correlations are not meaningful and provide no

---

[30] *Id.*
[31] *See* Baker Correspondence, *Rivers v. BP Expl. & Prod. Inc., et al.*, Case No. 20-cv-00029, Rec. Doc. 48-1 (N.D. Fla. Jan. 16, 2024).
[32] *See* Correspondence re: NOAA comments on Broader Gulf plan, attached hereto as **Confidential Exhibit 4.**
[33] *Id.* at 2.
[34] *Id.* (emphasis added).

information useful for injury assessment or quantification."[35] In sum, NOAA concluded that ***"the design of the plan is highly biased technically toward finding no oil and/or producing false negatives, directly contrary to its stated objectives."***[36]

<u>FRAUDULENT SAMPLING PRACTICES</u>

104.    BP's decision to exclusively rely on air monitoring was driven by its desire to maintain control and secrecy over the exposure monitoring data. The collection, analysis, and interpretation of the BP air monitoring data were not conducted or directed by independent and neutral scientists. Instead, BP entrusted its incentivized litigation support contractors and its own employees to validate (and invalidate) data and ensure that the data met proper Quality Assurance/Quality Control ("QAQC") criteria.[37] Unsurprisingly, the exposure data collected was flawed, marked by significant analytical and programmatic issues.[38] This approach resulted in a biased sampling process, where data was selectively underreported and invalidated.

105.    BP also only investigated samples that exceeded its non-health based "action levels", but left alone samples showing non-detections.[39] When BP did encounter air monitoring samples that showed benzene concentrations above detection limits, it conducted "investigations" into the data instead of directly publishing it.[40] These "questionable samples" were kept out of

---

[35] *Id.*
[36] *Id.* (emphasis added).
[37] *See* Affidavit of Dr. Ranajit Sahu at 5, *In re Deepwater Horizon BELO Cases*, Case No. 3:19-cv-00963, Rec. Doc. 654-4 (N.D. Fla. Sept. 22, 2023).
[38] Numerous governing scientists working with the BP Industrial Hygiene have found it unreliable in its raw state and negatively biased such that they have labeled Mr. Spencer's reliance data "left censored." *See* Huynh, Tran, et al. "Comparison of methods for analyzing left-censored occupational exposure data." Annals of Occupational Hygiene 58.9 (2014): 1126-1142 ("Over 150000 personal exposure measurements for an array of contaminants were collected; however, a substantial number of these measurements was below the limits of detection (LOD) reported by the analytic laboratories, or left-censored (Type I censoring)"). Laboratories that analyzed the BP Industrial Hygiene data based their Reported Limit of Detection "on compliance concerns rather than the analytic methods' capabilities." Stenzel, Mark R., et al. "Exposure assessment techniques applied to the highly censored Deepwater Horizon Gulf oil spill personal measurements." Annals of work exposures and health 66. Supplement_1 (2022): i56-i70
[39] *See* Email Correspondence re: Biased sample investigations, *In re Deepwater Horizon BELO Cases*, Case No. 3:19-cv-00963, Rec. Doc. 654-5 (N.D. Fla. Sept. 22, 2023).
[40] *See* Correspodence re: Sample results for discussion, attached hereto as **Confidential Exhibit 5.**

public databases or explained away and BP was cautioned to "communicate their existence and that they are being investigated in language approved by BP legal."[41]

106.    BP was not interested in scientifically defensible data validation for human health risk assessment; it was interested in data to protect itself against litigation. BP's lead Industrial Hygiene contractors mandated what was functionally a 'code of silence,' requiring technicians conducting sampling to *not record detections* prior to placing an un-recorded call to their supervisor.[42] The rationale behind this policy was to circumvent recordkeeping and later discovery. Fred Tremmel cautioned, "just because you have monitors, that doesn't mean you have to record and retain the data in them."[43] The rationale for not recording the data was that "unless you download the [detect or] data from the instrument into a PC or onto paper, it isn't a record. This applies to fixed monitors, personal monitors, portable direct reading instruments, etc."[44] Therefore, the unrecorded call to a supervisor served as BP's last line of defense for its contractors to exclude or invalidate samples showing detections of chemicals without legally being required to preserve them.

107.    BP's other scientific consultant appears to have followed a similar protocol when discussing the validity of samples, stating that "[d]epending on the situation, I try and keep my communications verbal only (phone and voice mail)."[45] The directive to keep sensitive communications verbal proliferated in BP internal emails.

108.    It was the "non-detections" that guided clean-up success and helped bolster litigation defenses for BP. When confronted with a proposal to cut back on air monitoring, emails

---

[41] *See id.*
[42] *See* Creed Correspondence, *In re Deepwater Horizon BELO Cases*, Case No. 3:19-cv-00963, Rec. Doc. 691-9 (N.D. Fla. Feb. 28, 2024).
[43] *See* Correspondence re: Recordkeeping for results from direct-reading instruments, attached hereto as **Confidential Exhibit 6.**
[44] *Id.*
[45] *See* Correspondence re: "Keep it verbal", attached hereto as **Confidential Exhibit 7.**

with BP lead hygienists Fred Tremmel, Kate Murray, David Dutton, and John Fink reveal BP's intention to exploit the sampling failures and inherent biases producing non-detections in the data:

> Although we are documenting zero exposures in most monitoring efforts, the monitoring itself adds value in the eyes of public perception, and _zeros add value in defending against future litigation_.[46]

Fred Tremmel, BP's lead industrial hygienist, sums up this rationale best, stating that the air monitoring program was "not really about exposure assessment", and instead was about "perceptions."[47]

Failure to Conduct Dermal or Biomonitoring

109.    BP knew that relying on its air monitoring program was insufficient to ensure the health and safety of both cleanup workers and the general public who might be exposed to BP oil and/or dispersants. Numerous entities advised BP that in addition to air monitoring, it was crucial to conduct biomonitoring and dermal monitoring. These measures would have provided a more comprehensive understanding of individuals' total exposure to specific chemicals, but BP refused to conduct such monitoring.

110.    Numerous peer reviewed scientific articles have been published on the utility of biological monitoring for cleanup workers in the wake of environmental catastrophes. Just six days before the BP Oil Spill, Franciso Aguilera, _et al._, published a scientific article in the Journal of Applied Toxicology, titled "_Review on the effects of exposure to spilled oils on human health,_" that "clearly support[s] the need for biomonitoring human populations exposed to spilled oils, especially those individuals involved in the cleanup, in order to evaluate not only the possible immediate consequences for their health but also the medium- and long-term health effects."[48]

---

[46] _See_ "Pulling the IH Monitoring Plug", _In re Deepwater Horizon BELO Cases_, Case No. 3:19-cv-00963, Rec. Doc. 691-8 (N.D. Fla. Feb. 28, 2024) (emphasis added).

[47] Correspondence re: VoO Sampling Plan, _Bruton v. BP Expl. & Prod. Inc., et al._, Case No. 17-cv-03110, Rec. Doc. 91-15 (E.D. La. Oct. 13, 2022).

[48] J. Appl. Toxicol. 2010; 30: 291–301 at 10.

This paper instructs the necessity to "establish detailed intervention protocols that include some mechanisms to detect and control the possible harmful health effects that exposure can induce, including performing the immediate collection of biological samples from the beginning of the cleanup work, in order to establish the levels of individual internal exposure effects at the acute and chronic level, especially those related to genotoxicity."[49] BP was aware of this article in the midst of the spill response yet elected to collect only data that would support its litigation defense.

111.    On June 28, 2010, Deputy NIOSH Director Margaret Kitt sent a draft NIOSH biomonitoring proposal to BP. While some BP leaders took issue with biomonitoring, BP's occupational medicine lead, Dr. Flower, came down squarely in support of doing biomonitoring for the specific purpose of to "confirm (or otherwise) the lack of exposure as indicated by air sampling."[50] Notably, Dr. Flower now agrees that if biomonitoring data had been collected when the clean-up workers were being exposed, it would now be helpful with ensuring the robustness of long-term worker health studies.[51]

112.    BP also received biomonitoring proposals from both NIEHS and OSHA. Despite this, BP made the deliberate choice to reject biomonitoring and opted to maintain its seriously deficient air monitoring program, which consistently showed non-detectable levels of harmful chemicals. This decision was motivated by BP's desire to bolster its anticipated litigation defense. By sticking to air monitoring alone, BP neglected to take action during the oil spill cleanup to gather evidence of the actual total exposure to specific chemicals. On June 26, 2014, then-NIOSH

---

[49] *Id.* at 1.
[50] Dr. Flowers Email Correspondence, *Bruton v. BP Expl. & Prod. Inc., et al.*, Case No. 17-cv-03110, Rec. Doc. 91-12 (E.D. La. Oct. 13, 2022).
[51] Dr. Flowers Depo. at 149:4-20, *Bruton v. BP Expl. & Prod. Inc., et al.*, Case No. 17-cv-03110, Rec. Doc. 91-9 (E.D. La. Oct. 13, 2022).

director John Howard affirmed that BP's decision to solely rely on air monitoring could lead to unreliable results because workers may be exposed through additional routes.

<u>Tainting Scientific Literature</u>

113.    BP and its contractors, like Exponent and CTEH, not only created unreliable exposure monitoring data but also tainted the available scientific literature and created a chilling effect on other research by generating "doubt science" to assuage the public and government's concerns about the human health and environmental impact of the Oil Spill.[52] As a result, scientists publishing on the health effects of the 2010 oil spill have only flawed worker monitoring data to work with, the bulk of which is "left censored" data or environmental data collected for litigation defense purposes that BP insists originate from attorney-directed, litigation workstreams.

114.    BP contributed $500 million to the Gulf of Mexico Research Institute ("GoMRI") – a ten-year research program to investigate the impacts of oil, dispersed oil, and dispersants on the ecosystems of the Gulf of Mexico and public health implications following the Deepwater Horizon Oil Spill.  GoMRI was intended to operate as "an independent research program, to be managed by a Board of Trustees, independent of BP,"[53] however, document evidence suggests BP employees intentionally steered attention away from research on human health impacts – which was notably only allocated three percent (3%) of the total budget.

115.    Although GoMRI was established to be an independent research consortium, BP's internal "health task logs" and publication trackers depict BP seeking to control the output of scientific literature.[54] On June 24, 2010, BP employees discussed "whether or not BP can influence

---

[52] *See* BP Publication Tracker, *In re Deepwater Horizon BELO Cases*, Case No. 3:19-cv-00963, Rec. Doc. 614-2 (N.D. Fla. May 4, 2023); *see also* Exponent Publication Tracker, *Guerrero v. BP Expl. & Prod. Inc., et al.*, Case No. 20-cv-00263, Rec. Doc. 96-3 (M.D. Fla. April 26, 2023).

[53] *See* Internal BP Meeting Notes, available online at https://www.scribd.com/doc/53064955/Internal-BP-meeting-notes

[54] *See* Health Task Log, *Gremillion v. BP Expl. & Prod. Inc., et al.*, Case No. 22-cv-03209, Rec. Doc. 30-4 (E.D. La. Nov. 29, 2023) ("legal review is necessary"; "legal needs to be involved"; "Need to review the minutes and follow up

[GoMRI studies] to undertake the studies [BP] believe will be useful . . . e.g., can [BP] steer the research In support of Restoration Ecology?"[55] On June 24, 2010, a BP manager asked, "Can we 'direct' GRI funding to a specific study (as we now see the Governor's offices trying to do)?"[56]

116.    The BP Defendants' funding of publications likewise obfuscated the long-term dangers of exposure to the oil and other chemicals that Plaintiff was exposed to. For example, the BP Defendants selectively funded and manufactured scientific doubt by supporting a significant amount of research on the effects of the Oil Spill for litigation defense; thus, the BP Defendants tainted, distracted, and biased the available literature and scientific data. The BP Defendants also hired and incentivized scientific consultants to defend against future litigation by generating non-detections in the 'dose' data and skewed results of testing so they were negatively biased. In sum, the BP Defendants' relentless promotion of the exposure to various substances present during the Oil Spill as innocuous dissuaded and prevented Plaintiff from linking his exposure during the Oil Spill to his diagnosis of Acute Lymphoblastic Leukemia ("ALL").

117.    The BP Defendants and the petroleum industry's history of sponsorship and ghost-authorship of scientific studies on petroleum exposures goes back decades. The American Petroleum Institute formed the Benzene Task Force, of which BP was a member and financial sponsor, and funded scientists to seed the literature with industry-favorable, conclusion-oriented science. The Benzene Task Force has summarized its "research approach" in the following manner:

> The scientific research program developed over the years by API's Benzene Task
> Force is designed to protect member company interests by developing strong
> scientific information on key benzene risk issues. This data, applicable across

---

with legal to confirm the scope for any future studies"; "Was sent to Nathan Block in legal 5/27 . . . Need approval for fitness to task.").

[55] Internal BP Meeting Notes, Correspondence dated June 24, 2010, available online at
https://www.scribd.com/doc/53064955/Internal-BP-meeting-notes

[56] Id.

environmental media, has use in advocacy, risk management, litigation and risk communication. More specifically, the research addresses the conservative interpretations of science and risk assessments of benzene's potency to induce adverse health effects.[57]

118.    Internal documents also provide insight into the API's member companies' internal 'litigation defense guide.'[58] This guide offers numerous suggestions to petrochemical companies facing product liability litigation and acts as a playbook for mounting a litigation defense. One such example includes raising the defense of "no scientific evidence of connection between benzene exposure and Plaintiff's disease."[59] The playbook also offers an "industry response" strategy, which includes "disclosing sensitive benzene documents only under court order" and "closely monitor outside counsel in joint defense cases to ensure control of documents and information."[60]

119.    BP's aim, through participation in the API's task forces, was to fund studies and regulatory/advisory lobbying efforts to alter – for the industry's benefit and without scientific basis – the dose threshold benchmarks, and related benzene regulations and rulemaking, by agencies or regulatory bodies. BP's participation in industry-funded benzene and oil exposure science was an attempt to fraudulently conceal the harmful effects of petrochemicals and crude oil.

120.    In 1990, the American Conference of Governmental and Industrial Hygienists (hereinafter "ACGIH") proposed lowering its benzene TLV from 1.0 ppm to 0.1 ppm. In response, Dennis Paustenbach, founder of ChemRisk, sent a letter to the API requesting money for conducting a quantitative risk assessment that would demonstrate a lower leukemia risk at low levels of benzene exposure, thus improving benzene person injury litigation defense for numerous

---

[57] *See* Summary of API's Benzene Research Strategy, attached hereto as **Exhibit 8.**
[58] *See* Shell Benzene Litigation Defense Guide, attached hereto as **Exhibit 9.**
[59] *Id.*
[60] *Id.*

corporate defendants. Paustenbach also stated that there would then be no need for the Government (EPA) to issue a rule to lower a standard for benzene emissions into the ambient air. Later, Paustenbach and ChemRisk published a purportedly "independent" study after numerous emails and phone calls with BP, which predictably found the airborne chemical exposures during the 2010 oil spill to be negligible.

121. Further, since 1977, the petrochemical industry withheld data from NISOH and OSHA during government rulemaking related to the toxicity of benzene among industrial employees. Inquiry directed at obtaining data in these situations mentioned was met with delay and intimidation. In another situation, the petrochemical industry withheld its own data analyses that demonstrated significantly elevated risks of non-Hodgkins lymphoma, multiple myeloma, and leukemia in relation to petroleum refinery exposures during government rulemaking for benzene. The petrochemical industry also withheld data indicating that benzene exposures prevailing in refineries at the time were resulting in blood abnormalities among exposed workers, who were being followed in a medical surveillance program.

122. The API and its member companies like BP have worked with their consultants to provide analyses that would result in leukemia risks being lower than currently thought at the time in efforts to influence government regulators to do nothing about risks to the general population, and to reduce liability from lawsuits related to diseases that may be associated with ambient air benzene exposures. API also funded research to counter evidence that benzene was associated with an elevated risk of Non-Hodgkin's lymphoma. The petrochemical industry also withheld data from governmental agencies during times of rulemaking that demonstrated chromosomal breakage among workers exposed to low levels of benzene and to experimental animals exposed to 1 ppm benzene for a single 6-hour period. These data were important because they demonstrated an

elevated risk of chromosomal breakage in workers and in experimental animals resulting from benzene exposure levels close to or at the newly promulgated permissible exposure limit of 1 ppm. Efforts also were directed to influence the American Conference of Governmental and Industrial Hygienists in 1990 to keep the benzene threshold limit value at 1.0 ppm rather than lowering it to 0.1 ppm as proposed.

123.    After the National Cancer Institute published a study demonstrating a dose response relationship between benzene exposure and the incidence of non-Hodgkin's lymphoma,[61] the API asked member companies, including BP, to fund support for research that would show no association between benzene exposure and NHL. The API disseminated a PowerPoint summarizing its goals. One slide titled "Project Value – How will Research Results Enhance Industry's ability to achieve objectives on issue of global impact and concern" states:

> The planned research is expected to:
> - Provide strong scientific support for the lack of a risk of leukemia or other hematological disease at current ambient benzene concentrations to the general population,
> - Establish that adherence to current occupational exposure limits (in the range of 1-5 ppm) do not create a significant risk to workers exposed to benzene.
> - Refute the allegation that Non-Hodgkin's lymphoma can be induced by benzene exposure."[62]

The API members of the Shanghai Health Study related to benzene are BP, Chevron Texaco, ConocoPhillips, ExxonMobil and Shell chemicals, LP.[63] API and BP knew the final results of the studies before they were even conducted.

124.    The API routinely funds epidemiological studies in the petrochemical space. Notably, many of these studies are fraught with misclassification bias. Instead of addressing the

---

[61] Hayes RB, et al. Benzene and the dose-related incidence of hematologic neoplasms in China. Chinese Academy of Preventive Medicine--National Cancer Institute Benzene Study Group. J Natl Cancer Inst. 1997 Jul 16;89(14):1065-71. doi: 10.1093/jnci/89.14.1065. PMID: 9230889.
[62] *See* Benzene Shanghai Study, Introduction/Background, January 26, 2001, attached hereto as **Exhibit 10.**
[63] *See* Clegg (May 2004), The Shanghai Health Study PowerPoint, attached hereto as **Exhibit 11.**

problem, API-funded research took advantage of this methodological error to generate study findings that are favorable to its cohort of petroleum industry clients.[64]

125.   In the 1960's, BP, Shell, and Exxon Mobil initiated a research institute named "CONCAWE." Essentially, CONCAWE is an organization funded in part by BP that was tainting the scientific literature and influencing regulatory decision making related to petroleum or petrochemicals. CONCAWE has routinely funded research consultants that downplay existing evidence on the link between oil products and cancerous diseases. CONCAWE studies are very clearly designed to add "value" to the industry. In fact, BP and CONCAWE organize publication trackers that rank the "impact" of their projects according to how it helped long-term interests.[65]

126.   This conduct by BP and the petrochemical industry continues to this day. In 2022, the European Union looked into tightening the laws on workers' exposure to benzene, which research has shown is strongly linked to the development of Acute Myeloid Leukemia. CONCAWE then set out to fund research that casts doubt on the epidemiological studies relied upon by the EU which highlighted the risk of benzene exposure.

127.   Industry sponsored publications and conclusions-driven science are not novel concepts. The promotion of scientific "doubt" or uncertainty through industry-sponsored studies has been well recognized by scholars.[66] Dr. David Michaels, OSHA's assistant secretary during the 2010 Oil Spill, spoke out against BP's incentivized contractor tasked with gathering exposure monitoring data in the wake of the Oil Spill, stating, "My experience working at government

---

[64] Gennaro V, Tomatis L. Business bias: how epidemiologic studies may underestimate or fail to detect increased risks of cancer and other diseases. Int J Occup Environ Health. 2005;11:356-9

[65] See Publication Trackers Composite Exhibit, *In re B3 Litig.*, Case No. 21-cv-05000, Rec. Doc. 15-1 (S.D. Ala. March 4, 2024).

[66] See e.g., David Michaels, The Triumph of Doubt: Dark Money and the Science of Deception (202020); David Michaels, Doubt is Their Product: How Industry's Assault on Science Threatens Your Health (2008); *see also* Reed, G., Hendlin, Y., Desikan, A. et al. The disinformation playbook: how industry manipulates the science-policy process—and how to restore scientific integrity. *J Public Health Pol* 42, 622–634 (2021). https://doi.org/10.1057/s41271-021-00318-6

regulatory agencies in both the Clinton and Obama Administrations has led me to conclude that CTEH's business model often entails providing clients with the ammunition to slow regulation or defeat court claims."[67]

128. BP also engaged or consulted ChemRisk to develop peer-reviewed publications solely to mount a defense against imminent litigation. ChemRisk is a for-profit scientific consulting firm that specializes in offering litigation defense to corporations accused of toxic torts or regulatory violations.[68] "In each case [ChemRisk] ha[s] developed arguments that could have the effect of delaying or weakening public health regulation of a powerful toxin."[69]

129. BP's relationship with ChemRisk occurred behind the scenes;[70] after all, NOAA scientists did notify BP of the fact that ChemRisk was "utterly compromised" and that the media would have a "field day" over a conflict of interest if BP retained ChemRisk to publish about the exposure data rather than another contractor.[71] Nevertheless, BP employees coordinated with outside counsel to propose and obtain scientific literature from ChemRisk.[72] And ChemRisk 'pitched' potential projects to BP that would set the stage for BP's litigation defense.[73]

---

[67] Michaels, D. (2023, March 14). *Conflicts of interest could undermine East Palestine cleanup*. Time. https://time.com/6262343/east-palestine-train-toxic-cleanup-conflicts-of-interest/

[68] "Worried about the possibility of lowered federal exposure regulations, expensive lawsuits and legal actions by sickened workers against API member corporations, including BP, API looked to Dennis Paustenbach and ChemRisk." Savage, Karen. *The American Petroleum Institute, ChemRisk and BP: An "Independent" Study or Industry-Influenced Science?* (Feb. 20, 2015), available online at https://bridgethegulfproject.org/blog/2015/american-petroleum-institute-chemrisk-and-bp-independent-study-or-industry-influenced

[69] Michaels, D., *supra* at 51.

[70] *See* Composite re: Distributing the Avens and Paustenbach Study, *Gremillion v. Stantec Consulting Servs. Inc., et al.*, Case No. 23-mc-00013, Rec. Doc. 10-1 (N.D. Fla. June 6, 2023).

[71] *See* Composite re: ChemRisk Consulting at 8, *Gremillion v. Stantec Consulting Servs. Inc., et al.*, Case No. 23-mc-00013, Rec. Doc. 10-3 (N.D. Fla. June 6, 2023).

[72] *See* Correspondence re: ChemRisk Study Proposals, attached hereto as **Exhibit 12.**

[73] *See* ChemRisk Study Proposals, attached hereto as **Exhibit 13.**

130.    In late 2011, ChemRisk published an article seeking to downplay the adverse effects experienced by the BP Oil Spill cleanup workers.[74] The Avens and Paustenbach Study was far from neutral scientific work – despite the fact that the article itself boasts its independence. This study relied on data BP collected and provided directly to ChemRisk from BP, even though not all the data was available or published. BP's industrial Hygienist had numerous email exchanges and unrecorded telephone calls leading up to ChemRisk's purportedly "independent" Study. Accordingly, there is indicia that ChemRisk's study was supported by, or intended to, benefit the American Petroleum Institute and BP's agenda despite the statement in the study that the work was "carried out and funded solely by ChemRisk."[75] This is consistent with ChemRisk's and Paustenbach's past behavior of committing ethical violations, and arguably academic fraud.[76] Alarmingly, BP's testifying experts in the litigation rely on ChemRisk's study and assert its independence and objectivity.

<u>BP's Misrepresentations to the Public</u>

131.    At all times during the spill—and even presently—BP maintains that the work environment was completely safe. BP has gone as far to assert that the chemical dispersants used to hide the visible oil on the surface waters were drinkable. Contrary to warnings in BP's own internal documents, BP misrepresented known risks by asserting that COREXIT was low in toxicity or safe. BP's CEO, Bob Dudley, stated that "the toxicity of COREXIT is about the same

---

[74] Avens, et al., *Analysis and Modeling of Airborne BTEX Concentrations from the Deepwater Horizon Oil Spill*. *Environ. Sci. Technol.* 2011, 45, 17, 7372–7379.
[75] *Id.* at 7378.
[76] A letter in the journal Epidemiology notes that a study ChemRisk was involved in was retracted because "financial and intellectual input to the paper by outside parties was not disclosed." Environmental Working Group then issued letters to censure Paustenbach of ChemRisk for his role in the study. https://www.ewg.org/news-insights/news-release/ewg-urges-censure-brockovich-scientist

as dish soap,"[77] and that the Gulf of Mexico is "an ecosystem that's used to oil. So, oil on the water is nothing new."[78] BP went on to state that the dispersants used in the Oil Spill had no ingredients that cause long-term health effects, like cancer. Further, while BP and the federal government reported that COREXIT was last used in July 2010, witnesses indicated that COREXIT was used after that time. Promotion of the exposure as innocuous dissuaded and prevented Plaintiff from linking his exposure during the Oil Spill to his Acute Lymphoblastic Leukemia (ALL), despite his diligent efforts.

132.    The BP Defendants also repeatedly obfuscated the dangers of exposure to oil and other petrochemicals. BP stated that, because the oil was "weathered," *i.e.*, subjected to time and distance, its oil was safe. The BP Defendants emphasized that residents were not being exposed to harmful levels of toxins capable of causing injury because any oil and/or COREXIT that did reach the shoreline and nearshore waters had been so degraded and weathered that it was not harmful to human health in any respect.

133.    The BP Defendants would often threaten Clean-Up workers with termination when they tried to wear respirators or additional safety equipment on the job because allowing workers to wear respirators would "scare the tourists" and create a negative public image. The absence of clean-up personnel who were allowed to wear personal protective equipment contributed to the general public's perception that the oil and dispersants did not harbor chemicals in sufficient quantities to produce harmful results. If Plaintiff had seen workers wearing respirators, he would have been more cautious of potential exposure to BP oil and dispersants.

---

[77] K. Savage, BP Head Bob Dudley Defends Dispersant Use, as Gulf Coast Communities Speak Out at Shareholder Meeting (Apr. 17, 2013), available at https://www.facingsouth.org/2013/04/bp-head-defends-dispersant-use-as-gulf-coast-communities-speak-out-at-shareholder-meeting.ht
[78] *Id.*

134.    Despite knowing that Polycyclic Aromatic Hydrocarbons, which are known carcinogens and developmental toxicants, can accumulate in seafood, BP's chief operating officer Doug Suttles stated publicly that he "absolutely would" eat Gulf of Mexico seafood and "would feed it to [his] family." Suttles went on to claim "there's been a tremendous amount of testing done by NOAA and the state agencies and the FDA and others. They're not going to open these waters to either sport fishing or commercial fishing if it's not safe to eat the fish."[79]

135.    These representations by BP induced countless individuals to consume contaminated seafood from the Gulf of Mexico during the time it was contaminated with BP's toxic substances. Plaintiff would have refrained from consuming seafood from the Gulf of Mexico if he was appraised that it could be contaminated with BP oil and/or dispersants.

136.    BP's untruthful post-spill conduct, failure to adequately monitor oil spill exposures, as well as its intentional omissions and misleading statements pertaining to worker monitoring data and potential long-term health effects from the Oil Spill, warrant that any applicable statute of limitations be equitably tolled.

B.    Discovery Rule

137.    Although it has been discovered that Plaintiff was diagnosed with Acute Lymphoblastic Leukemia (ALL) in approximately 2015, he did not discover and did not know of facts that would have caused a reasonable person to suspect that he was exposed to oil, other hydrocarbons, and other substances released from the MC252 Well and/or the Deepwater Horizon and its appurtenances and/or Dispersants and/or decontaminants used in connection with Response Activities which has resulted in his medical condition within the three-year timeline prescribed under 46 U.S.C. § 30106.

---

[79] Helena Bottemiller, *BP Exec Would 'Absolutely' Eat Gulf Seafood*, Food Safety News (Aug. 3, 2010), available online at https://www.foodsafetynews.com/2010/08/bp-exec-would-absolutely-eat-gulf-seafood/

138.   On approximately October 1, 2021, Plaintiff learned that his Acute Lymphoblastic Leukemia (ALL) may have been caused by his exposure to BP crude oil and dispersants after Plaintiff's mother saw a Downs Law Group advertisement suggesting a connection between exposure to oil spill constituents and the development of various cancers and conditions; and informed Plaintiff of the connection.

139.   Understanding the complexities of medical conditions such as Acute Lymphoblastic Leukemia (ALL) requires a significant level of scientific literacy and knowledge of biology – knowledge which a laywoman, such as Plaintiff, does not possess.

140.   At the time of his diagnosis, Plaintiff sought medical advice from his treating physician regarding the likely cause or etiology of his diagnosis. Plaintiff's physician could not offer any insight into the potential causes of Plaintiff's Acute Lymphoblastic Leukemia (ALL).

141.   Plaintiff did not have the information nor knowledge to link his diagnosis with his exposures to BP oil and/or dispersants and therefore could not inform his treating physician. Instead, Plaintiff reasonably relied on his physician's representations that Acute Lymphoblastic Leukemia (ALL) is an idiopathic disease.

142.   The effects of exposure to hazardous substances, like crude oil and dispersants, on human health are often nuanced and multifaceted, influenced by factors such as dosage, duration, route of exposure, individual susceptibility, and synergistic interactions with other chemicals or environmental stressors. Furthermore, the dissemination of information relating to potential health risks associated with exposure to hazardous substances is often mediated through scientific research, regulatory agencies, healthcare professionals, and public health campaigns. Accessing, interpreting, and evaluating epidemiological studies and other information to this effect requires

not only a certain level of education but also a certain level of scientific and computer literacy that Plaintiff does not possess.

## CAUSES OF ACTION

### COUNT I – NEGLIGENCE
### (against all Defendants)

143.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 – 142.

144.     At all times relevant to this action, Defendants participated in drilling operations onboard the *Deepwater Horizon* in the Gulf of Mexico.

145.     Defendants owed duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations of the *Deepwater Horizon* and maintenance of the vessel, its appurtenances, and equipment.

146.      Defendants owed duties of ordinary and reasonable care to Plaintiff to guard against and/or prevent the risk of an oil spill.

147.     Defendants owed a duty to warn Plaintiff of non-obvious dangers, such as chemical dispersants infiltrating beaches, marine animals, drinking water, intercoastal waterways, tributaries, and other areas along the greater Gulf Coast.

148.     Defendants further owed duties to those who might foreseeably be harmed, including Plaintiff, to exercise due care in the operation, maintenance, handling, design, implementation, and execution of the relief and recovery measures.

149.     At all times material to this action, Defendants breached their duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations of the *Deepwater Horizon* and maintenance of the vessel, its appurtenances and equipment and additionally owed and breached duties to Plaintiff to guard against and/or prevent the risk of an oil spill.

41

150.     Additionally, Defendants breached a duty to Plaintiff, including persons who might foreseeably be harmed, to exercise due care in the planning, operation, maintenance, handling, design, implementation, and execution of the oil spill relief and recovery measures.

151.     Defendants failed to warn and/or provide sufficient warnings, including recommended use of PPE, to Plaintiff of the non-obvious dangers and heightened risks associated with the oil spill and subsequent cleanups, such as chemical dispersants infiltrating beaches, seafood, drinking water, intercoastal waterways, tributaries, and other areas along the greater Gulf Coast.

152.     Furthermore, Defendants knew or should have known:

  i. Crude oil contains hazardous chemicals that are deleterious to human health and the environment;

 ii. The chemical and toxic dispersants used contain hazardous chemicals that are deleterious to human health and the environment;

iii. Individuals, such as Plaintiff, should have been made aware of the non-obvious dangers of the harmful effects of crude oil and/or chemical dispersants; and

 iv. Individuals, such as the Plaintiff, should wear PPE and/or respirators when in close proximity to the crude oil and/or chemical dispersants.

153.     The blowout and explosions on the *Deepwater Horizon*, its sinking, and the resulting oil spill were caused by the joint and concurrent negligence of all Defendants.

154.     On September 4th, 2014, Judge Barbier of the United States District Court for the Eastern District of Louisiana issued findings of facts and conclusions of law and found that the BP Defendants' conduct was reckless, the Transocean Defendants' conduct was negligent, and Halliburton's conduct was negligent and that each were liable under general maritime law for the

blowout, explosion, and subsequent oil spill from the Deepwater Horizon Incident.  *See In re Oil Spill*, 21 F.Supp.3d 657, 757 (E.D. La. 2014).

155.    The damages sustained by the Plaintiff as a result of the oil spill are apportioned as such:  BP Defendants 67% liable, Transocean Defendants 30% liable, and Halliburton 3% liable.

156.    In addition to Judge Barbier's finding and conclusions of facts and law, Defendants breached their duties by:

    i. Failing to warn Plaintiff of the harmful effects toxic and chemical dispersants, including benzene, as it comes into contact with Plaintiff;

    ii. Failing to properly warn Plaintiff to avoid exposure to hazardous substances encountered in connection with the oil spill and clean up;

    iii. Failing to maintain, monitor, and operate the *Deepwater Horizon* in a reasonably safe manner so as to avoid harm to foreseeable individuals, such as the Plaintiff;

    iv. Failing to inspect the BOP to ensure that it was not faulty and/or would fail during use so as to avoid harm to foreseeable individuals, such as the Plaintiff; and/or

    v. Failing to otherwise exercise reasonable care in the planning, operation, maintenance, handling, design, implementation, and execution of the cleanup/relief and recovery measures to avoid harm to foreseeable individuals, such as the Plaintiff.

157.    Plaintiff was exposed and came into contact with oil, other hydrocarbons, chemical dispersants, and/or other substances through the eyes, nose, mouth, skin, and/or airways.

158.    As a direct and proximate cause of Defendants' negligence, Plaintiff was exposed to the aforementioned chemical dispersants and/or toxins and suffered, and continues to suffer, significant injuries including Acute Lymphoblastic Leukemia (ALL) and suffers physical pain, mental anguish, loss of enjoyment of life, loss of work, disability, disfigurement, incurred medical and travel expenses in the care and treatment of his injuries, suffered physical handicap and his

ability to take care of himself.  These injuries were foreseeable and a natural and probable consequence of Defendants' negligence.

159.    Furthermore, as a direct and proximate cause of Defendants' negligence, Plaintiff's exposure to the proven hazardous substances was greater than normal background levels and, therefore, significantly increase Plaintiff's risk of contracting and/or developing a serious latent disease.  A monitoring procedure exists that makes early detection of the disease possible, the prescribed monitoring regime is different from that normally recommended in the absence of the exposures, and the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

WHEREFORE Plaintiff demands judgment against all Defendants as follows:

i.    Past and future medical expenses;

ii.    Medical monitoring;

iii.    Past and future lost wages;

iv.    Pre-judgment and post-judgment interest;

v.    Past and future loss of personal services;

vi.    Any and all supplemental state law remedies available to Plaintiff;

vii.    Past and future intangible losses including those for physical pain and suffering, loss of life's enjoyment, mental anguish, anxiety, emotional distress, and fear of cancer and future medical issues; and

viii.    Any other relief this Court deems just and proper.

## COUNT II – GROSS NEGLIGENCE
### (against BP Defendants)

160.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 – 142.

161.    BP Defendants owed duties of ordinary and reasonable care to Plaintiff in connection with the drilling operations of the *Deepwater Horizon* and the maintenance of the vessel, its appurtenances, and equipment.

162.    BP Defendants also owed duties of ordinary and reasonable care to Plaintiff to guard against and/or prevent the risk of an oil spill.

163.    BP Defendants also owed a duty to warn Plaintiff of non-obvious dangers, such as chemical dispersants infiltrating beaches, seafood, drinking water, intercoastal waterways, tributaries, and other areas along the greater Gulf Coast.

164.    BP Defendants further owed duties to those who might foreseeably be harmed, including Plaintiff, to exercise due care in the planning, operation, maintenance, handling, design, implementation, and execution of the relief and recovery measures.

165.    Furthermore, BP Defendants knew or should have known:

  i.    Crude oil contains hazardous chemicals that are deleterious to human health and the environment;

 ii.    The toxic and chemical dispersants used contain hazardous chemicals that are deleterious to human health and the environment;

iii.    Individuals, such as Plaintiff, should have been made aware of the non-obvious dangers of the harmful effects of crude oil and/or chemical dispersants; and

iv.    Individuals, such as the Plaintiff, should wear PPE and respirators when in close proximity to the crude oil and/or chemical dispersants.

166.    BP Defendants additionally focused primarily on profit while disregarding the public's and environment's health and safety while undertaking ultra-hazardous activities on the *Deepwater Horizon*. BP Defendants' conduct was reckless and/or willful and wanton and

disregarded the rights and/or safety of Alabama residents and others of the Gulf States, such as the Plaintiff, by:

     i.    Performing a critical well pressure test with untrained and unqualified personnel and ignoring and/or misinterpreting abnormal "red flag" pressure test results;

    ii.    Using a well design with too few barriers to gas flow;

   iii.    Failing to use a sufficient number of centralizers to prevent channeling during the cement process;

   iv.    Failing to run a bottoms-up circulation of the drilling mud prior to beginning the cement job;

    v.    Failing to run a cement bond log to evaluate the integrity of the cement job;

   vi.    Failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well;

   vii.    Using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes;

  viii.    Grossly inadequate maintenance, and reckless and improper operation and use of the BOP appurtenant;

   ix.    Failing to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the *Deepwater Horizon* in the event of a blowout;

    x.    Failing to ensure that adequate safeguards, protocols, procedures, and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill;

xi.   Failing to warn the public, such as the Plaintiff, of:

i.   the harmful effects of the DW Toxic Chemicals and Toxic Dispersants;

ii.   the harmful effects of exposure to these substances; and/or

iii.   the use of proper protective clothing and respirators when in close proximity to the areas affected by the BP Oil Spill.

xii.   Failing to use reasonably safe dispersant chemicals in the attempt to respond to the oil spill;

xiii.   Willfully using Corexit despite the EPA issuing directives for BP Defendants to use less toxic dispersants than Corexit; and

xiv.   Willfully failing to comply with and/or ignoring EPA's directive to reduce the use of surface and subsurface dispersants.

167.   Plaintiff was exposed and came into contact with oil, other hydrocarbons, chemical dispersants, and/or other substances through the eyes, nose, mouth, skin, and airways.

168.   The aforementioned acts and conduct by the BP Defendants were reckless and/or willful and wanton.

169.   BP Defendants knew or should have known that their reckless and/or willful and wanton conduct would foreseeably cause Plaintiff's injuries.

170.   As a direct and proximate cause of BP Defendants' reckless and/or willful and wanton acts, Plaintiff was exposed to the aforementioned chemical dispersants and/or toxins and suffered, and continues to suffer, significant injuries including Acute Lymphoblastic Leukemia (ALL), and suffers physical pain, mental anguish, loss of enjoyment of life, loss of work, disability, disfigurement, incurred medical and travel expenses in the care and treatment of his injuries, suffered physical handicap and his ability to take care of himself has been impaired.  These injuries

were foreseeable and a natural and probable consequence of BP Defendant's reckless and/or willful and wanton acts that led to the oil spill and subsequent cleanup efforts.

WHEREFORE Plaintiff demands judgment against BP Defendants as follows:

    i.    Past and future medical expenses;

    ii.    Past and future lost wages;

    iii.    Punitive damages;

    iv.    Pre-judgment and post-judgment interest;

    v.    Past and future loss of personal services;

    vi.    Any and all supplemental state law remedies available to Plaintiff;

    vii.    Past and future intangible losses including those for physical pain and suffering, loss of life's enjoyment, mental anguish, anxiety, emotional distress, and fear of cancer and future medical issues; and

    viii.    Any other relief this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable.

Respectfully Submitted,

**THE DOWNS LAW GROUP, P.A.**

*/s/ C. David Durkee*
C. David Durkee, ESQ.
Florida Bar No.:  998435
Rachel Martin, ESQ.
Florida Bar No.: 1040205
3250 Mary Street Ste 307
Coconut Grove, FL 33133
Telephone: (305) 444-8226
Facsimile: (305)-444-6773
Email: ddurkee@downslawgroup.com
        rmartin@downslawgroup.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing was served to all counsel of record registered to receive electronic service as attorneys of record in the Court's electronic filing system.

Dated:  August 30, 2024

*/s/ C. David Durkee*
**C. DAVID DURKEE**